E. I. Du Pont de Nemours & Co. *v.* E. L. Bruce Co.

*(Nashville,* December Term, 1938.)

Opinion filed Feb. 4, 1939.

CHARLES L. CORNELIUS, of Nashville, A. L. HEISKELL and DAVID A. BALLON, both of Memphis, and ABEL KLAW, of Wilmington, Del., for Du Pont.

CANADA & RUSSELL, of Memphis, for Bruce.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

E. L. Bruce Company, a Delaware corporation, referred to herein as "Bruce," instituted this suit against E. I. Du Pont de Nemours & Company, also a Delaware corporation, designated herein as "Du Pont," to recover damages for a breach of express and implied warranties of a chemical known as "Lignasan," used in treating large quantities of oak lumber.

The jury returned a verdict in favor of Bruce for $126,239.82. The trial court directed a remittitur of $61,572.94, which was accepted under protest, and judgment entered for $64,666.88. Both parties appealed to the Court of Appeals.

In the trial court each party made a motion for a directed verdict. The court sustained the motion of Du

Pont, insofar as a recovery was sought for a breach of implied warranty, but submitted to the jury the question as to whether there was an express warranty and, if so, whether it was breached.

In the trial court both parties contended that since the contract was in writing and unambiguous it was the duty of the court to decide whether there was an express warranty rather than submit that issue to the jury.

There was no motion for a new trial, or appeal by Bruce from the action of the trial court in directing a verdict as to implied warranty, in the absence of which the Court of Appeals held that it could not consider that question, and its action in so holding is not questioned in this court.

The Court of Appeals further held that it was the duty of the trial court to construe the written contract and determine, as a matter of law, whether it contained an express warranty that Lignasan would not cause a discoloration of oak lumber. The court further held that the contract did not contain such an express warranty; that the trail court should have sustained the motion of Du Pont for a directed verdict, and it, accordingly, reversed the judgment of the trial court, sustained the motion of Du Pont for a directed verdict, and dismissed the suit. Both parties have filed petitions for *certiorari;* counsel for Du Pont raising certain questions pretermitted by the Court of Appeals which they ask this court to determine only in the event that the petition of Bruce is granted.

One of the serious problems of lumbermen has been damage resulting from sap stain, which is the natural result of stacking green lumber, and is caused by a fungus growth which works into the pores of the sapwood

and gives it a dark, dingy color. Sap stain penetrates into the grain of the wood and cannot be dressed out. It is much worse in pine and sap gum than other woods, and is worse in warm, damp climates.

In 1930, the United States Department of Agriculture, Du Pont, and other chemists, had been conducting various experiments with a view of producing a chemical that would prevent sap stain. Lignasan, manufactured by Du Pont, as a result of various tests in 1930, was found effective as a preventive of sap stain.

The first sale of this chemical by Du Pont was on September 25, 1930. This was a new chemical, which was still being tested by the United States Department of Agriculture, when Bruce began using it in March, 1931. It was used by Bruce from March to October, 1931. On December 7, 1931, Bruce wrote Du Pont a letter in which it said:

"We have been using your Lignasan dip since last April and find it very satisfactory on all woods except oak. We have been dipping our Oak up until about thirty days ago, at which time we found on taking the dry lumber down that it was badly stained. Whatever the cause of this stain, the lumber came out with a kind of inky blackness which gives it a very unsightly appearance."

It is conceded that Lignasan absolutely prevents sap stain in all woods, and that the discoloration complained about is not sap stain; that this discoloration in oak was not caused by Lignasan, but by iron tannate, which is ink formed by the tannic acid contained in the oak lumber and the iron contained in the dipping vat and the greenchain coming in contact. Oak lumber dipped in pure water which has been permitted to come in contact with iron will discharge tannic acid into the water,

and the iron and tannic acid will form iron tannate, which is ink, and cause the lumber to be discolored. If a nail is driven into green oak lumber an inkish discoloration will appear at the point where the nail penetrated the lumber.

There is evidence that oak was considered a light stainer, and that in the early development of Lignasan it was not contemplated that it would be treated with that solution. Du Pont, upon discovering in the summer of 1931 that oak was being so treated resulting in its discoloration, undertook to correct this condition, and did correct it by adding certain other ingredients to Lignasan.

Bruce operated three large sawmills, one at Laurel, Mississippi, another at Bruce, Mississippi, and the third one at Oak Grove, Louisiana. Its executive offices were located at Memphis, and were in charge of George Mc-Sweyn, who was vice-president and director of the sawmill operations. T. H. Harris was the manager of the Laurel mill. Late in 1930 Harris attended a meeting of lumbermen where he secured two samples of pine and sap gum lumber treated with Lignasan. Early in 1931, while McSweyn was visiting the Laurel plant, Harris exhibited these samples, and McSweyn was so impressed with their effectiveness in preventing sap stain that he carried them to Memphis and on February 10, 1931, had the following letter mailed to Du Pont:

"Please quote us on your powder to make up the K1 solution for dipping lumber for the prevention of sap stain. We do not know whether this comes in bags or barrels and when you quote please let us know how many pounds of the powder is required for a gallon of the K1 solution for the proper treatment of the lumber through the dipping vat.

"Please make your quotation f. o. b. Laurel, Miss."

On February 16, 1931, Du Pont replied as follows:

"We wish to acknowledge with thanks the receipt of your letter of Feb. 10 requesting information concerning our lumber sap stain preventive, Lignasan.

"Lignasan is a very powerful disinfectant and only 1 pound of the powdered material is required to each 50 gallons of water in the dipping vat. Inasmuch as 50 gallons of the solution is sufficient for treating 5,000 to 6,000 feet of average lumber you can readily see the cost of dipping would be in the neighborhood of 10c per thousand board feet of lumber. Lignasan solution does not need to be heated to control sap stain, consequently there is much less evaporation from the dipping vat than when a hot solution is used as well as a saving in steam for heating.

"All tests conducted so far shows that Lignasan does not cause yellowing or other objectionable discoloration of lumber. The solution in the concentration recommended for dipping lumber has not shown any signs of injury to the hands of the workmen around the mill. This solution is not corrosive to metals, therefore, can be safely used in steel vats and is not injurious to the greenchain.

"Another advantage of Lignasan is that it gives equally good control of stain on both pine and sap gum. This enables the mill cutting both of these woods to use one solution.

"A very complete report of the results obtained in a large number of tests conducted through the South by Mr. R. M. Lindgreen, of the U. S. Dept. of Agriculture, is given in the Dec. 1st, 1930, issue of the Southern Lumberman. This article appears on page 57 of that magazine.

You can readily see from this that Lignasan designated as No. 745 in these tests, gave control of stain quite superior to the product now generally used.

"Lignasan is packed in 300 pound steel drums and in quantities of 300 pounds or more, but less than 5,000 pounds, it sells for $.50 per pound. In quantities of 5,000 pounds or more, but less than carload lots, the price is $.48 per pound, while in carload quantities it is $.46 per pound. The above quotations are all f. o. b. our plant at Carneys Point, N. J.

"According to information supplied our Traffic Dept. by the carriers, the freight rate on Lignasan from our plant at Carney's Pt., N. J., to Laurel, Miss., is $1.17 per cwt. in L/C/L lots. In carload lots, they inform us that the rate is $.78½ per cwt., minimum gross weight 30,000 pounds. We understand these rates are on the basis of a shipment by rail from here to New York and from N. Y. to New Orleans by water and from New Orleans to Laurel by rail.

"Thanking you for your interest and trusting that we may have the pleasure of supplying your requirements for a stain preventive, we are."

The statement in the foregoing letter, "All tests conducted so far shows that Lignasan does not cause yellowing or other objectionable discoloration of lumber," is the basis of the claim of express warranty. That was a true statement of fact. At that time only one test as to oak lumber had been made, the report simply showing that the test was unsatisfactory since the lumber had been infected previous to dipping and "must be repeated with uninfected material." This statement appears in the article in the Southern Lumberman, to which the attention of Bruce was directed in the letter of February

16, 1931. Bruce was a subscriber to this magazine, but McSweyn testified that he did not read the article referred to.

It is the insistence of Du Pont that attached to the letter of February 16, 1931, were written instructions for the application of Lignasan, in which it was stated that the use of this chemical was not warranted; that a card containing the same information was hung in the office of Harris and in the mill at Laurel; and that a sticker was posted on the inside of the head of each drum of Lignasan stating that this preparation was not warranted. McSweyn and other officials testified that they saw none of these cards or stickers, and did not know that Du Pont was claiming that Lignasan was not warranted until December, 1931. The jury, however, found this issue against Du Pont, and that question is only referred to for the purpose of showing the contention of Du Pont.

McSweyn, upon returning from Laurel to Memphis in the early part of 1931, decided to use Lignasan for the purpose of preventing sap stain, and thereupon wrote Harris to have a vat installed at the Laurel plant for that purpose. Upon the installation of the vat, and before ordering any Lignasan from Du Pont, to wit, on March 16, 1931, Bruce borrowed 200 pounds of Lignasan from a neighbor mill that was using this solution, and treated a large quantity of lumber, including oak, before placing its first order with Du Pont on March 24, 1931.

It will be observed that Bruce, in its letter of February 10, 1931, to Du Pont, simply inquired as to the price of its solution for the prevention of sap stain, and before placing an order for same tested and conducted its own experiments with this new process.

█ Under the Uniform Sales Act it seems that the seller's intention to warrant or not to warrant is unimportant. 24 R. C. L., 167; 55 C. J., 688; Williston on Sales (2 Ed.), 368.

The definition of an express warranty, section 7205 of the Code, is as follows:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

In 55 C. J., 687, it is said:

"To give a representation the effect of a warranty it must have been made to assure the buyer of the truth of the fact asserted and induce him to make the purchase."

█ In Willison on Sales (2 Ed.), section 194, the rule is stated in this language: "The Sales Act makes it clear that an affirmation of fact (that is, a representation) is a warranty and not merely evidence of a warranty, if its natural tendency is to induce the buyer to purchase the goods and the buyer thus induced does purchase them. In some States this was clearly recognized before the enactment of the Sales Act, but in other States it was not."

There seems to be no division in the authorities upon this question, many cases supporting the rule being cited in the respective briefs. As we interpret these authorities, when a seller states or represents a fact that induces a prospective customer to buy, such statement or representation constitutes an express warranty, and if

untrue, then the buyer may recover damages for the breach.

In this case the only fact represented was that "All tests conducted so far shows that Lignasan does not cause yellowing or other objectionable discoloration of lumber." That was a true statement of fact. Another uncontroverted fact is that Lignasan does not cause objectionable discoloration. The record does show that the tannic acid in oak when brought in contact with the iron dipping vat and iron greenchain will discolor the dipping fluid, whether Lignasan or pure water, and this fluid then stains the lumber. This fact was not known to Du Pont when it wrote Bruce on February 16, 1931, and Du Pont did not expressly warrant that such treatment would not discolor oak lumber. Of the softwoods, which are more susceptible to sap stain, and all hardwoods, which include oak, ash, elm, magnolia, hickory, cottonwood, and cypress, oak is the only wood that developed this discoloring. In the letter of February 16, 1931, the attention of Bruce was specifically directed to page 57 of the December 1, 1930, issue of the Southern Lumberman magazine for a complete report of the results obtained in a large number of tests with Lignasan. Had Bruce taken the pains to read this article it would have discovered that Lignasan had not been tested on oak lumber.

Bruce made no inquiry as to the advisability of treating oak with Lignasan. The samples of treated lumber which induced Bruce to use this preparation did not include oak, and there is nothing in the record to indicate that Du Pont had any idea that Bruce intended to dip oak lumber in Lignasan when it wrote the letter of February 16, 1931. The only reference in that letter to any par-

ticular kind of lumber is that contained in the following statement:

"Another advantage of Lignasan is that it gives equally good control of stain on both pine and sap gum. This enables the mills cutting both of these woods to use one solution."

■■ With regard to any express warranty the contract is clear, specific, and unambiguous, its provision being that "All tests conducted so far shows that Lignasan does not cause yellowing or other objectionable discoloration of lumber." Since this fact is not controverted, there was nothing to submit to the jury. A false statement as to this fact might have raised a jury issue.

The Court of Appeals, after detailing the facts and circumstances surrounding this controversy, announced its conclusions in this language:

"We think that under all the facts and circumstances as disclosed by the record that Lignasan was in a comparatively experimental stage, but the experiment had been sufficient to show that it was efficacious as a preventive of sap stain in lumber. So far as the record discloses oak lumber had not been extensively, if at all treated for sap stain. No doubt this is largely due to the fact that oak lumber is not generally subject to sap stain as are other woods. We think that if this preparation, Lignasan, had failed to cure and prevent sap stain, the specific purpose for which it was manufactured and sold to the lumber trade, then the language used in the letter of February 16, 1931, would amount to an express warranty that it would successfully prevent sap stain in lumber dipped in the solution. The further statement in the letter, to the effect that 'All tests conducted so far shows that Lignasan does not cause yellowing or other

objectionable discoloration of lumber,' was correct. There is no proof in the record that tests made with Lignasan had caused 'yellowing or other objectionable discoloration of lumber.'

"Keeping in mind the essential elements constituting a warranty under Section 12 of the Uniform Sales Act or at common law, can it be said that the language used in the letter with respect to the tests so far made constituted a warranty that lumber dipped in the solution would not result in a discoloration. The provision being: 'Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon . . .' What affirmation of fact is contained in the letter other than that the preparation would prevent sap stain in lumber? We think the language of the letter contains the affirmation of the fact that Lignasan would prevent sap stain in lumber dipped in the solution. It is conceded that so far as that affirmation of fact is concerned it is not subject to challenge, since all the proof shows that lumber dipped in the solution made of Lignasan effectively prevented sap stain. As to the statement in the letter regarding discoloration of lumber dipped, it merely stated that the tests so far made showed that it did not cause discoloration, and was not injurious to the hands of the employees using the solution. The letter then made specific reference to the report of Mr. R. M. Lindgreen contained in the lumber magazine generally circulated and read by lumbermen and those interested in the lumber industry.

"There was no affirmation of fact other than that the 'tests so far made.' So far as the record discloses, all

tests that had been made at the time of the writing' of the letter did not show that dipping lumber in the solution caused any discoloration. We can not see how this language could be construed as an affirmation of fact that the use of the preparation, Lignasan, would not cause a discoloration of the lumber dipped in the solution. It merely stated that so far as tests already made it did not show that it would cause a discoloration of lumber.

"Again, the discoloration of the oak lumber was due to the inate character of oak as distinguished from other varieties of wood, in that oak contains tannic acid. It is shown by the proof that the Lignasan did not release the tannic acid from the oak lumber, but if the lumber had been dipped in clear water without the introduction of any chemical, the effect of the tannic acid by coming into contact with the iron greenchain and the iron dipping vat would have resulted in iron tannate, which would discolor the fluid and this discoloration would appear on the dipped lumber. It also appears that the reason why pine and gum and perhaps other lumber dipped in the vat did not show any discoloration was because these other woods did not contain tannic acid as did the oak. It was not the effect of the Lignasan that caused the discoloration, but according to the uncontradicted evidence it was due to the tannic acid in the oak lumber coming into contact with the iron dipping vat and greenchain that caused the discoloration of the dipping fluid which discolored the lumber.

"We can not escape the conclusion that since this is a suit based solely upon an express warranty which warranty is alleged to have been contained in a contract consisting of the letter of February 16, 1931, that there is sound basis for the contention that the contract con-

tained an express warranty as to the effect on the lumber with respect to the discolored lumber dipped in the solution. Nor do we find that there is any ambiguity with respect to the language so used and here under consideration.

"We think the great weight of authority is to the effect that the general rule is that if the alleged warranty is in writing it becomes a question of law for the court. However, there may be exceptions to this general rule. In 24 R. C. L., under the head of Sales, Section 438, it is thus stated:

"'If the facts or affirmations relied on to prove an express warranty rest wholly or partly in parol, it is ordinarily the province of the jury to determine whether they amount to an express warranty; but according to the better view the court must determine whether an affirmation contained in an agreement in writing amounts to a warranty or not, and the same has been held true as regards an undisputed and unequivocal oral affirmation.'"

The court then cites numerous authorities holding that where the agreement is altogether in writing it is for the court to say whether the contract contains an express warranty.

As previously stated, the only express warranty as to discoloration is with respect to "tests so far made;" and this fact not being controverted, the trial court should have directed a verdict in favor of Du Pont.

We concur in the conclusions announced by the Court of Appeals and therefore deny both writs.